Cottingim v. Reliastar Life. Mr. Dawson. Pardon me. I've got to adjust this. Please do. I appreciate you doing it. Not everything is designed for me. I understand. What's that? The podium raises. The lectern raises. Oh, I see. Look at that. See? Some things are designed for you. Apparently so. Okay, cool. Thank you very much. Sorry about that. Hold on. Let's get started. Okay. Good morning, Your Honors. Gerald Dawson for Appellant Kevin Cottingim. May it please the Court. I noticed earlier, Chief Judge Pryor, that you were discussing the fact that sometimes insurance companies draft provisions in a way that almost seems calculated and misunderstood. I'm happy to say that this is not such a case. And I'm happy to tell you that Reliastar Life Insurance Company drafted a clear policy of disability insurance governed by ERISA that covered Mr. Cottingim. And the basic test of disability is whether the insured is prevented by sickness or injury from performing the duties of their regular occupation. Now, we submit that the chronology of this case establishes a cognitive decline suffered by Mr. Cottingim over a two-year period resulting from brain disease, brain damage that rendered him unable to do his job as a human resources vice president at the time he ceased working. Now, this is a cognitive disability claim. Reliastar's stated reason for denying the claim was that Mr. Cottingim's recent neurocognitive test scores were generally in the average range or, quote, within normal limits, unquote, is a phrase that they like to use. Cognitive levels were normal and broadly within the cognitive requirements. The two occupational analyses established that his occupation required. Well, Your Honor, his occupation, according to… It may be that that could be true even though he no longer performs his job as well as he used to perform it. I'm not sure I understand your question, Your Honor. Well, it may be true that the neuropsychological tests that he completed each showed that his cognitive levels were normal and broadly within the requirements that the two occupational analyses established that his occupation required. That can be true even if he doesn't today perform his job as well as he used to perform it. Well, our position, Your Honor, is simple and it's supported by ample case law cited in our briefing. And that is that it's undisputed, according to Reliostar's own vocational analysis, that Mr. Cottingim's occupation required, quote, high levels of cognitive ability, specifically a high level of general learning aptitude, a high level of verbal aptitude, and a high level of numerical aptitude. And there's a system of categories that Reliostar used for that. The occupational analysis that you commissioned states that it has to be general learning ability and verbal aptitude at the extremely high level or above 89th percentile. But Dr. Samuelson, retained on your advice, measured your client's IQ to be in the 91st and 97th percentile, right? 97th percentile? I believe, Your Honor, that it's undisputed that all the testing was generally average or broadly within normal limits. I don't think anyone has questioned that. There are certain scores where he did well and certain ones where he, you know, did less well. But I think it's completely undisputed that the reason for denying the claim was that you can't be disabled, according to Reliostar, if your abilities are generally average or normal. What we're saying is that his occupation undisputedly required high levels of aptitude, not average. And if he clearly had a cognitive decline that rendered him unable to do the job, not only... Also, the insurance policy says to be under the definition of disability, you must be under the appropriate care of a doctor in order to be considered disabled. And as I understand it, you are not contesting the fact that, in fact, Reliostar's position that your client was not under the appropriate care of a doctor. You're not saying that, that he meets that test, right, of disability? Oh, he absolutely... The appropriate care provision would not apply to Mr. Cottingham, even if Reliostar had timely asserted the appropriate care provision as required by law. Let's assume that Reliostar has, in fact, timely asserted that he is not under the appropriate care of a doctor. How is he under the appropriate care of a doctor? I can't comment on his medical care. What I can say is that the purpose of an appropriate care provision such as this one renders it clearly inapplicable to Mr. Cottingham. The case that's cited by Reliostar on this is the Mack case, which is an unpublished case from this circuit. And that dealt with an appropriate care provision. And what this court said, or what the panel said, was that the purpose of a provision like that, the obvious purpose, they said, is to encourage disability claimants to seek proper medical care in order to get healthy. In order to get well. In order to... It seemed to me the problem... I'm sorry, Your Honor. Who each advised him to seek alcohol use, to cease his alcohol use, and that he didn't follow it. He didn't follow that advice. Not completely. According to the record, he reduced it but did not cease it. The problem with that analysis is that, again, the purpose of such a provision is to make sure you're going to get... That seems to me to be the problem of appropriate care, is he's not following his doctor's advice. Well, respectfully, Your Honor, even if he had followed that advice, his primary treating neurologist, Dr. Hunter, who is very highly credentialed, stated directly and clearly that Mr. Cottingham's brain damage is both permanent and irreversible. And no amount of medical care would have gotten him better. No amount of medical care would have made him well or healthy or enabled him to return to work. You don't have to have a full recovery, though, to have the cognitive ability to still perform the occupation, even if you have suffered some permanent damage. But you at least need to be following your doctor's advice. I respectfully disagree. Whether or not he... But that's not going to mitigation and trying to improve his health. I mean, I think even in the record, Dr. Salmonson, really the main supporter for your client, even recognized that the substance use significantly contributed. And it does not appear from the record that there was any real attention paid to that medical advice. The substance, the alcohol use, may well have contributed. In fact, Dr. Hunter said it probably did. As a legal matter, that's not relevant except as pertains to the appropriate care provision. There's no alcoholism or alcohol abuse exclusion in the policy. With respect to the appropriate care provision, I repeat my position that according to Dr. Hunter, there was no way his condition, Mr. Cottingham's condition, was going to improve. And therefore, to deprive him of disability benefits based on the appropriate care provision, assuming, of course, that Roy Leisler has any business raising that in this court, which I would insist vehemently that it does not, he was not going to get better. Let me ask you a question about that point that you're raising, that we should not be looking at the post hoc justifications of Roy Leisler and you are claiming that Roy Leisler raised the objection of the appropriate care too late. But under our review, in our Hill case from 2020, we say our review in this type of case is de novo, which means we look only to the text of the plan in light of the facts presented in the case. We also say what the actual administrator said in justifying his decision is irrelevant to this step one analysis. And we are, in fact, at step one. So under the Hill case, it appears we can review anything in the record regardless of what Roy Leisler said it was or was not relying on, right? You can because there is no Eleventh Circuit precedent that says you can't. But you should not. It says what the actual administrator said in justifying its decision is irrelevant to this step one analysis. So that's Eleventh Circuit published case 971F3RD1321. Which is case law saying we can do that. I am not familiar with that case. I don't believe it was raised by the other side. Benefits Administration Commission of Mueller Group, LLC. 2020. Our published case. If the position of the court is that I'm simply wrong on whether the appropriate care provision can or should be considered, then I would accept that. I'm not in a position to dispute that authority. I would appreciate an opportunity to brief it, if that were permissible, since I've just been told of it now. Failing that, I would again emphasize that there is no, to apply that provision to Mr. Cottingen would be the ultimate elevation of form over substance. Okay, Mr. Dawson. Let's hear from your opposing counsel. Thank you, Your Honors. You've saved five minutes. Designed for you, too. There you go. Good morning, Your Honors. Wendy Furman on behalf of Reliastar Life Insurance Company. Your Honors, the plaintiff has argued here that the district court erred in affirming Reliastar's claimed decisions, that plaintiffs claimed cognitive decline rendered him disabled from performing his own occupation. We disagree. Principally, the plaintiff claims that this decline in cognitive function was the evidence to support impairment and disability. Your Honor, I think we've already identified that the fact of a decline from a pre-existing level of superior performance. Does not mean that you're disabled. Correct. And that is the position that we've identified and supported with the case law, as well as significant evidence from not just the reviewing physicians and the examining physician, Dr. Boone, that Reliastar retained to evaluate this claim. And, in fact, Mr. Cottingen, but also his own treating doctors to the extent they were providing treatment or neuropsychological testing. And as you identified, you're absolutely right. Mr. Atkinson, the vocational analysis performed by the plaintiff, had identified that this 89% was required of the learning ability, general learning ability, verbal aptitude. And, in fact, it was Dr. Salmonson's findings that Mr. Cottingen's IQ was in the 91st to the 97th percentile and his verbal comprehension index was in the 98th percentile. So, even according to the plaintiff's own evidence and as supported by the independent medical evaluation and neuropsychological testing that Reliastar went out and actually obtained in order to clarify this information, Mr. Cottingen clearly had the cognitive capacity. We could affirm just on that basis alone, could we not? Yes, Your Honor. With respect to the appropriate care issue, there's multiple deficiencies in plaintiff's argument. First, I would point to the fact that over the time period from 2019 when Mr. Cottingen first underwent psychological testing with Dr. York and then a year later underwent another set of neuropsychological testing with his own doctor, Dr. Duncan, there was an improvement noted during that period of time. And that is consistent with the fact that he reported that he had begun to curtail his alcohol use somewhat, but not as he had been instructed to do by the doctors to abstain from alcohol use. So, the evidence substantiates that even though the brain lesions that were present in 2019 based on the MRI performed in 2019 consistent with the timing of the neuropsychological testing performed by Dr. York remained stable. He, in fact, had an improvement in his cognitive functioning likely related to some of his cessation of the amount of drinking that he had performed. So, I disagree that there was no basis for a requirement that he seek care. And, in fact, as Your Honors have identified, it's a requirement of the policy. And as we've heard here this morning of all these cases, we are living and dying by the terms of insurance policies in these cases. The terms of both the short-term and the long-term disability policy require extensive requirements in terms of evidence of impairment. But also that the insurer go out and seek appropriate care and treatment from the right type of doctor directed to ameliorating the specific disabling condition. And it sounds from your own statement that he did and that his condition at some point did improve. But it didn't get him back to the same level of performance that he maintains makes it impossible or very difficult for him to perform his duties. Your Honor, Dr. Duncan's neuropsychological testing showed some improvement. So, there was a level of improvement. That was around the time that he stopped working. So, he actually had improved immediately before the time that he stopped working. And yet, the evidence was that he claimed to be disabled as of that time and recognized, even speaking with Dr. Hunter, that he was concerned that his improvement on this neuropsychological testing could defeat his disability claim. But instead of going and seeking out further care to try and improve his condition, what Mr. Cottingham did was continue to seek further evaluations, continue to seek evidence from former coworkers to try to substantiate his claim. And this was contrary to the care and recommendations of his multiple treating physicians, which did not just focus on the need to cease alcohol use, but also to seek treatment potentially for alcoholism, which is different than alcohol use. There are references throughout the records to both alcoholism, which is a disease and a disorder, but then there's also references to alcohol use. In basic understanding of alcohol, it causes impairment. Driving under the influence is when you drive under the influence of alcohol, you're impaired. And the evidence supports that Mr. Cottingham had an extensive history of abuse and use of alcohol. And his doctors, recognizing that, had instructed him to cease using alcohol, but he did not. But they also instructed him, and this was Dr. Hunter as well as other doctors that were treating him, to seek behavioral health treatment. And as identified in the short-term disability denial letter, Reliance Star pointed out that the requirement to seek behavioral health care treatment had not been complied with. So in obtaining records and looking for the treatment and care that Mr. Cottingham would have been seeking if he had, in fact, been experiencing a disabling condition, Reliance Star went out and sought medical records from his prior treating physicians, and there was no behavioral health care records in there. So this was something that the treating doctors had identified as appropriate care for him to pursue in an effort to ameliorate any cognitive impairment that he was experiencing. Because anxiety, depression, common mental health conditions can significantly impair your cognitive functioning. And so those were things that were identified in addition to potentially the brain disease or brain damage that had been identified on the MRI as potentially causing cognitive impairments to the extent they were present. You've got multifactorial causes here. At a minimum, Mr. Cottingham had the obligation to pursue the treatment designed to ameliorate each of those different conditions. And in the short-term disability denial letter, they specifically cited the appropriate care requirement and put him on notice of that. So this issue of post hoc justification is really a red herring. This is something that was cited in the short-term disability denial letter and the appeal, and then the appropriate care requirement as part of the definition of disability was again cited in the long-term disability denial letter. At that point in time, Reliance Star had the additional medical evidence in terms of Dr. Boone and other treatment records and still did not see the care being sought. But its expert's opinion was that there was not an impairing behavioral health condition. So Dr. Speka, who identified that there was no impairing behavioral health condition causing cognitive impairment based upon Dr. Boone's reports, and therefore there was no specific requirement at that point in time for him to seek appropriate care for a behavioral health issue. We still had the issue of the alcohol use not being fully addressed. So from your perspective, this isn't even about a battle of the experts. It sounds your contention is that if all of the experts agreed that he needed to at least take this step in terms of the alcohol and therefore failure to do that means he didn't meet the standards. Yes. And with respect to the... If, though, he's not disabled. Yes. If the fact that there was a... Failed to establish his inability to perform his occupational duty. Right. And that's based on not just the treating doctor's records, but then we actually do have in this case, which is significant, the neuropsychological testing that was performed by Dr. Boone. In addition to the evidence that established that this was a condition that Mr. Cottingham had been able to successfully continue working with for at least a year since the 2019 MRI, he reported that these conditions had been in existence and potentially problems that his employer had identified with his performance for approximately a year or two years, and yet he had been able to continue working up until the time that he negotiated his resignation and a severance package that coincided with the exact timing of his claim of impairment that was not in fact ordered by any doctor. He went to Dr. Hunter over the summer of 2020 to seek additional testing and evaluation, not pursuing any of the treatment recommendations, but Dr. Hunter never told him that he had restrictions or limitations, that he should not be working, that he could not be performing his job, and in fact when he filled out the attending physician statement, Dr. Hunter did not fill in when asked if there are any other restrictions, any limitations, other than those identified above in the form, to please fill those in, and nothing was written there. In fact, Mr. Cottingham acknowledged that when he contacted ReliaSTAR over the summer to explore the possibility of submitting this disability claim, he was identifying that he was planning to file a disability claim, he was also going to be negotiating a severance package, and so he was exploring how all these pieces were going to work and fit together, not consistent with an onset of a disability, and also not consistent with the fact that in fact during that time period his condition appeared to improve based on cognitive testing. With respect to the post hoc argument that's been raised, obviously we contend that that is not compliance with the Eleventh Circuit precedent that we have cited. Eleventh Circuit has recognized, and this is consistent with the overall view of de novo review, and so the Harris case that this court has announced is that you will be able to be reviewed. She cited Harris, 2022 decision. And it says, and my clients live with it, we have to consider new evidence. Well, how can you consider new evidence if you are always bound by an old decision? To impose plaintiff's requirement as to post hoc rationales in a de novo review situation would force you to negate the Harris decision. And that would be because in Harris the court has said new evidence can come in. So obviously there will be new, if there are new evidence... You get to make the benefits determination anew. Based on the record, right? I mean, it's not so much a new evidence as a de novo review. That's what the case law is really talking about, isn't it? It is, Your Honor, and that's one of the things that we're not just looking at arbitrary and capricious. You are looking very narrowly at the decision under review. Was that decision... Was it de novo correct? You can look at the whole record anew, de novo, and say, oh, well, we would have made the same decision for a different reason than the one that they... And really, the cases cited by Mr. Cottingham's counsel with respect to new decisions, entirely new decisions, you know, new basis for the decision, are highly distinguishable from this case where the entire basis for Relia star's denial was that Mr. Cottingham simply had failed to carry his burden of proof of establishing his disability. The element of appropriate care is a key part of the proof of disability. Plaintiff always bears that burden. Essentially, the plaintiff is trying to shift that burden to Relia star as to the appropriate care, making that something that Relia star had the burden to come forward with. We've pointed out that he's not satisfied that condition of both of the policies. Okay. I think we understand your case. Okay, I just... I would point out that 11th Circuit does look for compliance with notice requirements, looks for substantial compliance. That's the Perino and the Counts decision. So, and furthermore... Let me say, you don't waive anything that's addressed in your... Okay. Thank you, Your Honor. Mr. Dawson. Yes, thank you. May it please the Court. I'm hearing speculation about the possibility that Mr. Cottingham, although he was undisputedly diagnosed with neurocognitive disorder 10 months before he ceased working, and even though he undisputedly had a cognitive decline from where he once was, maybe he still retained enough cognitive ability to scrape by and manage to do his job. However, we have in the record, as I know... The burden was on you to establish that he couldn't. Yes, Your Honor. And it appears on this record that you didn't establish that. If I may say, Your Honor... It's not enough to establish that it declined. His direct superior, the chief operating officer of his employer, directly informed Reliastar that Mr. Cottingham could no longer do the job he had been hired to do, that his performance had declined to a point where it was unacceptable, that he, Mr. Gallaberg, the COO, took personal measures to remediate Mr. Cottingham, requiring Mr. Cottingham to take notes during meetings, to read those notes back to Mr. Gallaberg, to bring those notes to subsequent meetings, etc. And this was simply dismissed by Reliastar and dismissed by the district court. The problem with that is the inquiry is not an inquiry about whether his particular employer was satisfying. The question is whether, as his occupation is performed in the national economy, whether he could perform the occupation. It's not that limited subjective inquiry. It's a more objective inquiry. In addition to Mr. Gallaberg, there was also Mr. Baer, who was an executive at the company and a close colleague of Mr. Cottingham's who worked with him for years, and also described in detail the various ways in which Mr. Cottingham's impairments evidenced themselves in the workplace. And ERISA case law, and I know it's in our brief and I know you've read it, is amply replete with cases in which courts took seriously and credited contemporaneous real-time observations of colleagues, coworkers, supervisors, etc. I think we cite literally 10 or 12 cases in our brief. And for this court to say that such observations simply don't matter and should be brushed aside, obviously the court can do that, but it would certainly be going against the vast majority of ERISA case law that has addressed that question. So we have real-time contemporaneous observations from people who worked with him and for whom he worked. And our belief is that that has to count for something. What Reliostar is saying, essentially, is that Mr. Gallaberg and Mr. Baer were part of a conspiracy to defraud Reliostar, a conspiracy masterminded by Mr. Cottingham. And not only was Mr. Gallaberg in on it for some unknown reason, and not only was Mr. Baer in on it for some unknown reason, but all the doctors who examined him, his treating neurologist who said he did not have the mental acuity for his occupation, that's Dr. Hunter. The statement that Dr. Samuelson is our main advocate is simply not true. His main advocate was Dr. Hunter, his treating neurologist, who stated very clearly that not only was his brain damage irreversible, but that he lacked the requisite mental capacities for an executive position. That's all on the record, and it's not disputed other than to say, well, he had an average IQ, so he was fine. So does that speak to the appropriate care, meaning that there wasn't any appropriate care available that would have improved his condition? And so even though we can consider that on de novo review, it doesn't matter? That's exactly what I'm saying, Your Honor. His treating neurologist, and this is completely undisputed, stated very clearly, and I know I'm repeating myself, I'm sorry, but he stated very clearly that Cottingham's brain damage is irreversible. And, quote, his condition and cognition would not improve, quote, even with perfect risk control going forward, unquote. So again, to apply the appropriate care provision to Mr. Cottingham would elevate form over substance. No amount of doctor visits, no amount of care was going to make this man better. No amount of care was going to improve his condition to the point that he could return to work. His treating neurologist, I see him out of time, his treating neurologist, I'll just finish my sentence, was abundantly clear about that. Thank you, Your Honors. Thank you, Mr. Dawson. We're in recess until tomorrow.